## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION (DAYTON)

| | |
|---|---|
| Kenny Thomas Enterprises, Inc. (d/b/a Olathe Toyota), on behalf of itself and all those similarly situated, | Case No: 3:18-cv-29 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| | **<u>DEMAND FOR JURY TRIAL</u>** |
| vs. | |
| CDK Global, LLC, and The Reynolds and Reynolds Company. | |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 4

PARTIES .................................................................................................................................... 7

JURISDICTION AND VENUE ................................................................................................. 7

FACTUAL ALLEGATIONS ...................................................................................................... 9

    A.    To A Dealership, Effective Data Management Is Critical ............................ 9

    B.    Dealerships Have the Right and Need to Grant Vendors and Data
        Integrators Access to Data They Store in Their Data Management
        Systems ............................................................................................................ 9

    C.    CDK and Reynolds Control and Dominate The DMS Market ................................. 10

    D.    CDK and Reynolds Participate in Both The Markets for Data
        Management and Data Integration Services ............................................... 11

    E.    CDK and Reynolds Entered Into A Per Se Illegal Horizontal
        Agreement to Allocate Market Share in the Data Integration Services
        Market ............................................................................................................ 12

    F.    CDK and Reynolds Use Their Market Power to Impose Exclusive
        Dealing Agreements That Prevent Competition in The Market for Data
        Integration Services ...................................................................................... 14

    G.    In Addition to Exclusive Dealing Arrangements, CDK and Reynolds
        Also Use Technological Means to Exclude Data Integrators from The
        Market ............................................................................................................ 14

    H.    CDK and Reynolds Successfully Exclude Competitors in The Data
        Integration Market ........................................................................................ 15

    I.    The Price for Data Integration Services Skyrockets After CDK and
        Reynolds Exclude Third-Party Integrators ................................................. 15

    J.    CDK and Reynolds Break Integration with Their Platforms to
        Maintain Their Duopoly ............................................................................... 17

    K.    CDK and Reynolds Develop A Pretext for Cutting Off Vendors and
        Integrators' Access to the CDK and Reynolds Platforms: Data Security................... 19

    L.    Plaintiff's Experience..................................................................................... 20

    M.    Federal Indirect Purchaser Claims .............................................................. 20

CLASS ACTION ALLEGATIONS ........................................................................................ 21

ANTITRUST INJURY ............................................................................................................ 24

COUNT I:    VIOLATION OF SECTION 1 OF SHERMAN ACT FOR
               ENTERING A HORIZONTAL AGREEMENT TO REDUCE
               COMPETITION IN THE DATA INTEGRATION SERVICES
               MARKET........................................................................................................ 26

COUNT II:    VIOLATION OF SHERMAN ACT FOR IMPOSITION OF
               EXCLUSIVE DEALING PROVISIONS ................................................... 27

COUNT III:   VIOLATION OF SHERMAN ACT FOR ILLEGALLY TYING THE PROVISION OF DATA INTEGRATION SERVICES TO THE PURCHASE OF DATA MANAGEMENT SERVICES ........................................... 28

COUNT IV:   VIOLATION OF SECTION 2 OF SHERMAN ACT FOR MONOPOLIZATION OF THE DMS AND DATA INTEGRATION SERVICES MARKETS ............................................................................................ 29

COUNT V:    UNJUST ENRICHMENT ........................................................................ 32

COUNT VI:   VIOLATION OF KANSAS UNFAIR TRADE AND CONSUMER PROTECT ACT FOR ENTERING A HORIZONTAL AGREEMENT TO RESTRAIN COMPETITION IN THE MARKET FOR DATA INTEGRATION SERVICES ............................................................................ 32

COUNT VII:  VIOLATION OF KANSAS UNFAIR TRADE AND CONSUMER PROTECTION ACT FOR IMPOSITION OF EXCLUSIVE DEALING PROVISIONS ............................................................................ 34

COUNT VIII: VIOLATION OF KANSAS UNFAIR TRADE AND CONSUMER PROTECTION ACT FOR TYING THE PROVISION OF DATA INTEGRATION SERVICES TO THE PURCHASE OF DATA MANAGEMENT SERVICES ...................................................................... 35

COUNT IX:   VIOLATION OF KANSAS UNFAIR TRADE AND CONSUMER PROTECT ACT FOR MONOPOLIZATION OF THE DMS AND DATA INTEGRATION SERVICES MARKETS ...................................................... 37

PRAYER FOR RELIEF ................................................................................................. 39

DEMAND FOR JURY TRIAL ....................................................................................... 40

## **INTRODUCTION**

1.     This case concerns the illegal and anticompetitive practices of duopolists in the markets for data management and integration systems sold to auto dealerships. The brains of an auto dealer's operation is its data management system ("DMS"). The DMS stores all data relevant to the dealership, from payroll to inventory to customer information. Without the DMS, the dealership's operations come to a screeching halt. The dealer cannot manage inventory, secure vehicle financing for customers, transfer title for vehicles it sells, pay its bills, or pay the commissions it owes.

2.     While a powerful DMS is necessary, it is not sufficient for dealers to run their businesses. Data extracted from the DMS is in a raw format, which needs to be cleaned up, reformatted, and organized in such a way that it can be useful to both dealers and the many vendors with which they do business. Dealers regularly give third-party vendors access to the information stored in their DMS system. In fact, the average dealership uses eighteen different pieces of vendor software to run their day-to-day operations. These vendors and their software cannot do their jobs without having access to the dealer's DMS database. This process of transforming the raw data in the DMS into a usable format which can function with vendor software is called "data integration." Thus, in addition to the DMS, dealers need data integration services.

3.     There are two dominant players in the DMS market, Defendants CDK Global and Reynolds & Reynolds, which together control 75% of the market. For decades, both CDK and Reynolds assured their customers (the dealerships) that the data that dealers gathered and stored in their DMS systems belonged to the dealers. CDK and Reynolds were adamant that dealers could do whatever they wanted with their own data, including allowing data integrators to access the data to make it usable for vendors.

4

4.      At one time, over a dozen companies offered data integration services. These services were relatively inexpensive, costing an average of about $50 per month per dealership. CDK and Reynolds offered their own data integration services, but were only one of many options.

5.      In 2007, however, Reynolds decided to cut off all third-party access to its DMS platform, locking out all third-party data integrators. If a vendor wanted integration services for data in Reynolds' system, their only option was Reynolds.

6.      At that time, CDK criticized Reynolds' attempt to corner the market in data integration services by effectively holding dealers' data hostage. In 2007, the CEO of CDK was asked whether his company planned to cut off third-party access to CDK's platform. In response, he said, "I think we've stated pretty emphatically, we really believe the dealer owns the data…. I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it when in fact it's really the data belonging to the dealer."

7.      CDK and other data integrators developed software workarounds so they could still get access to dealer data that was trapped inside the Reynolds DMS. Like a game of whack-a-mole, Reynolds would discover the workarounds and find ways to disable them.

8.      Soon, Reynolds decided that it wanted more than just a technological barrier to accessing data in its DMS. Reynolds added a provision to its contract with vendors proffering a devil's choice: agree not to use any third-party integrators to access data in the Reynolds platform, or else Reynolds will cut off *your* access to the Reynolds platform. For vendors, access to their customers' data was their lifeblood. Many had no choice but to sign Reynolds' exclusivity agreement.

9.      For nearly a decade, CDK vocally opposed Reynolds' creation of a moat

around the data in its system. That data was not Reynolds' to begin with, the logic went, so Reynolds had no right to lock it down and hold it hostage.

10.     But in 2015, under pressure from an aggressive hedge fund manager, CDK's position radically changed. CDK decided to cut off all third-party access to its own DMS platform.  Worse, CDK entered into an agreement with Reynolds not to offer a competing data integration service for accessing data within the Reynolds DMS.

11.     Without access to data inside either of the "Big 2" DMS platforms, third-party data integrators started dying off. For example, the data integrator Authenticom said it was "insolvent and on the verge of collapse" after Reynolds and CDK cut off to its access to its clients' data within their systems.

12.     Having cornered the market for providing data integration services for their own DMS platforms, CDK and Reynolds began charging supracompetitive prices. Vendors that had been paying third-party integrators only $30 per month for data integration services started having to pay nearly $900 a month to Reynolds for the same service. CDK raised its data integration prices by between 300 and 800 percent.

13.     Vendors started passing on these increased costs to the dealers who had hired them. Dealers were understandably upset to learn they were paying an exorbitant fee to gain access to their *own data* within the CDK or Reynolds DMS.

14.     Plaintiff, Kenny Thomas Enterprises, Inc., an auto dealer in Kansas, now brings suit against CDK and Reynolds for violating federal and state antitrust law. CDK's and Reynolds' antitrust violations include that the "Big 2" DMS providers signed an agreement not to compete with each other in the data integration market; they unlawfully forced vendors to sign agreements not to use third-party integrators; they created an unlawful "tie" between their DMS service and their data integration services – forcing dealers who

bought the former to also pay for the latter; and they illegally monopolized the market for data integration services, using improper means to exclude their competitors from the market, rather than competing with them in good faith, such as by offering a better price or value.

15.     Plaintiff also brings a claim for unjust enrichment to prevent CDK and Reynolds from profiting from their decisions to hold dealer data hostage.

## PARTIES

16.     Plaintiff Kenny Thomas Enterprises, Inc. (d/b/a Olathe Toyota) is a Delaware corporation with its principle place of business in Olathe, Kansas, where it owns and operates a retail car dealership.

17.     Defendant CDK Global, LLC, is a publicly traded Delaware corporation with its corporate headquarters and principle place of business located in Hoffman Estates, Illinois.

18.     Defendant Reynolds and Reynolds Company is an Ohio corporation with its corporate headquarters and principal place of business located in Kettering, Ohio.

19.     *Co-conspirators*. Various others, presently unknown to Plaintiff, participated as co-conspirators in the violations alleged in this complaint and performed acts and made statements in furtherance of those violations. The acts charged in this complaint have been done by Defendants and their co-conspirators or were authorized, ordered or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action on behalf of more than one hundred putative class members for damages that exceed $5,000,000.00, exclusive of interest and costs, and at least one Plaintiff and one

Defendant are citizens of different states.

21.     This suit involves federal claims under the Sherman Act, 15 U.S.C. §§ 1, 2, and the Clayton Act, 15 U.S.C. §§ 15, 16.

22.     Over the federal claims, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are so closely related to the federal claims that they form part of the same case or controversy.

23.     Defendants are subject to personal jurisdiction in this Court because Defendant Reynolds and Reynolds Company has its headquarters and principle place of business in this state, Defendants are registered to do business in this state, and Defendants have engaged in substantial, continuous, systematic, and non-isolated business activity within this state.

24.     Venue is proper within this District pursuant to the Clayton Act, 15 U.S.C. §§15, 22, 26, and 28 U.S.C. § 1391(b), (c), (d). Defendants are registered to do business, transacted business, were found, and had agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce has been carried out in this District.

25.     As described in the complaint, Defendants' unlawful conduct has substantially affected interstate commerce by harming competition and increasing prices to the detriment of Plaintiff, dealers, and vendors throughout the nation.  Defendants provided their products and services across the nation, and the markets for DMS and data integration services are nationwide markets. Defendants sold a substantial amount of DMS and data integration services within the continuous and uninterrupted flow of interstate and foreign commerce,

and as intended, their actions substantially affected that commerce.

## FACTUAL ALLEGATIONS

26.    The relevant markets are: (1) the United States market for data management services; and (2) the market for data integration services.

### A.    To A Dealership, Effective Data Management Is Critical

27.    Dealership data is crucial to success in the retail automotive industry, and dealers input that data into a database within their dealer management system ("DMS"). A dealership's DMS is the critical software that operates as the business's central database and is the repository of all of its operational information. Dealerships utilize their dealer management systems to generate, store, and manage their data, including data for accounting, payroll, insurance information, inventory for vehicles and parts, customer information, completed and pending sales, vehicle financing, and service management. A dealer has only one DMS provider at a time.

28.    The DMS market consists of suppliers that sell and market DMS services to automobile dealerships. The relevant geographical market is the DMS market in the United States. There are no reasonable substitutes for the enterprise software and services provided by DMS providers.

### B.    Dealerships Have the Right and Need to Grant Vendors and Data Integrators Access to Data They Store in Their Data Management Systems

29.    It is widely accepted in the retail automotive industry that dealers retain ownership over the data they create and store in their DMS database, and retain control over access to that data. CDK and Reynolds have both made public statements confirming that dealers own and control their data. For example, Reynolds spokesman Tom Schwartz admitted that, "[t]he data belongs to the dealers. We all agree on that." CDK similarly

9

confirmed that it "has always understood that dealerships own their data."

30. Dealers engage third-party application providers or other vendors to provide services to assist them in operating their automotive businesses. Dealers authorize the vendors to access their data, which the vendors use to provide services such as inventory management, customer relationship management, and electric vehicle registration and titling.

31. To access and extract the data stored on the data management systems, vendors need data integrators to convert the dealers' raw data into a usable format. Vendors engage data integrators to extract, format, and organize the data stored on the dealer's DMS into a form suitable for the specific service provided by the vendor. In turn, vendors pass on to dealers the cost of data integration.

### C. CDK and Reynolds Control and Dominate The DMS Market

32. CDK and Reynolds, referred to as the "Big 2" DMS providers, dominate the DMS market, together controlling approximately 75 percent of the market. CDK controls about 45 percent and Reynolds controls about 30 percent.

33. CDK and Reynolds have enormously lucrative DMS businesses. A single, small dealership will pay up to $150,000 per year to license and use the DMS software and services offered by CDK and Reynolds. A mid-size dealership group (5 to 10 stores) will pay $1.5 million or more per year. And a large dealership's costs to license and use DMS can easily top $5 million per year.

34. CDK and Reynolds are tremendously profitable, which is unsurprising given that they serve thousands of dealerships at the above prices. Both companies have profit margins exceeding 40 percent. CDK's market capitalization is almost $9 billion.

35. Once a dealer begins using a particular data management service, it is nearly impossible to switch because switching would cause serious business disruption. According

10

to a whitepaper by *Oracle*, a typical data migration takes between six months and two years. Migration also requires that all staff be completely re-trained on the new system. Dealers have described migrating their central database to a new DMS provider as akin to performing a "heart transplant." Due to high switching costs, there are substantial barriers to entry in the DMS market.

36.     Vendors also depend on, and cannot provide their services without, access to the CDK and Reynolds' DMS platform and the dealers' data within them. There is no other way for vendors to feasibly access dealers' data without access to the CDK and/or Reynolds platforms.

**D.     CDK and Reynolds Participate in Both The Markets for Data Management and Data Integration Services**

37.     Dealers frequently engage vendors to perform essential services for the dealer, such as facilitating auto financing or transfer of title. But vendors cannot directly use the data from a dealer's DMS platform. Vendors need a data integration provider to extract, aggregate, clean, and format the pertinent data into a format that is usable by the vendor's software.

38.     The market for data integration services consists of companies that specialize in accessing, aggregating, and formatting dealers' data from a DMS database. The relevant geographical market is the United States. There are no reasonable substitutes for the services provided by data integrators to dealers and vendors.

39.     CDK and Reynolds compete not only in the market for data management services, but also in the market for data integration services. When acting as data integrators, CDK and Reynolds transform dealers' raw data into a format that is usable by the vendor and appropriate for the services the vendor provides. CDK and Reynolds sell data integration services to vendors.

11

40.     In contracting with a vendor, the dealer authorizes the vendor to employ a data integrator and authorizes the data integrator to access the dealer's data within the dealer's DMS platform. The vendor pays the data integrator for their services in extracting the dealer's data and typically passes on the cost of data integration to the dealer, as part of its contract with the dealer.

41.     For CDK and Reynolds, data integration is a separate service from data management and involves a separate fee. Typically, CDK and Reynolds charge the dealer for the data management services and the vendor for data integration services. As vendors pass on the cost of data integration, dealers end up paying twice for access to their own data: once for their own access to the DMS and once for their vendor's access.

**E.     CDK and Reynolds Entered Into A Per Se Illegal Horizontal Agreement to Allocate Market Share in the Data Integration Services Market**

42.     For many years, CDK and Reynolds recognized and publicly acknowledged that dealers maintain ownership over their data when they place their data within CDK or Reynolds' data management system. And CDK and Reynolds recognized and publicly acknowledged that dealers that placed their data in CDK or Reynolds' systems had the right to allow anyone the dealer wanted to have access to the data.

43.     Prior to 2015, CDK and Reynolds had different policies with respect to providing data integration services, and CDK offered integration services for data coming from the Reynolds' DMS platform. In 2007, however, Reynolds began blocking data integrators from accessing dealer data that resided in Reynolds' DMS platform.

44.     At first, CDK was a vocal opponent of Reynolds' access restriction. In 2007, the CEO of CDK disavowed that CDK would ever block access to dealer data, stating, "We're not going to prohibit [dealers from permitting their vendors to access their data]. I think we've stated pretty emphatically, we really believe the dealer owns the data. Obviously,

12

they have to grant permission . . . . I don't know how you can ever make the opinion that the data is yours to govern and to preclude others from having access to it when in fact it's really the data belonging to the dealer. As long as they grant permission, how would you ever go against that wish?" CDK even developed a workaround to circumvent Reynolds' blocking of CDK's access to dealer data in Reynolds' DMS. The workaround was called "SMART-R," and CDK told its data integration customers that "when Reynolds and Reynolds blocks our access to your data on your dealership management system, we cannot perform the tasks you have asked us to perform. SMART-R is a new process that is intended to work within the restrictions implemented by Reynolds and Reynolds."

45.     But CDK's position changed dramatically in February 2015, when CDK and Reynolds entered into formal written agreements not to compete with each other in the data integration market and to eliminate competitors in that market. CDK agreed that it would no longer compete in providing access to dealer data on the Reynolds DMS. The agreements ensured that CDK and Reynolds would be the exclusive providers of data integration services for dealer data on their respective DMS platforms.

46.     The agreements provided that CDK would stop providing data integration services to dealers that used the Reynolds platform. The agreements also provided that CDK and Reynolds would coordinate the transition of vendors from using one company's integration services to using the other's. CDK gave Reynolds five years of free integration services for the CDK platform.

47.     CDK and Reynolds agreed that, in the future, they would not "help others access" the other's DMS platform.

48.     The purpose and effect of these agreements was to reduce competition in the data integration services market and allow CDK and Reynolds to collect supracompetitive

13

profits, which are profits above what can be obtained in a competitive market.

### F. CDK and Reynolds Use Their Market Power to Impose Exclusive Dealing Agreements That Prevent Competition in The Market for Data Integration Services

49. CDK and Reynolds have used their market dominance to impose a series of exclusive dealing provisions on dealers. The exclusive dealing provisions prevent dealers from providing access to their own data to any entity other than their DMS provider.[1] Without access, vendors cannot furnish the data to any third-party data integrators. Instead, vendors are forced to use CDK or Reynolds' data integration services. Vendors are prevented from seeking a more competitive price for integrating dealer data into the vendor's platform.

50. CDK and Reynolds also prevent vendors that use CDK or Reynolds data integration services from obtaining the service from any other provider by imposing exclusive dealing provisions in their vendor contracts. These exclusive dealing provisions require vendors that do any business with CDK or Reynolds to agree that they will not use any other company's data integration services. These agreements purport to be indefinite in duration, meaning that even if a vendor stopped contracting with CDK or Reynolds for data integration services, the vendor would be unable to do business with any other data integrator, forever.

### G. In Addition to Exclusive Dealing Arrangements, CDK and Reynolds Also Use Technological Means to Exclude Data Integrators from The Market

51. After Reynolds and CDK prevented third-party integrators from accessing data within their DMS platforms (in 2007 and 2015, respectively), some integrators were able to develop "workaround solutions" that allowed them continued access to their

---

[1] The Reynolds "Master Agreement" says that dealers cannot "provide access to any Licensed Matter [Reynolds DMS software] or non-public portions of the Site to any third party." Section 6.B of the CDK "Master Services Agreement" provides that the "[dealer] is not authorized to cause or permit any third party software to access CDK Dealer Management System except as otherwise permitted by this agreement." (emphasis removed).

customers' data. Authenticom, for example, worked with dealers "to develop workaround solutions that circumvented Reynolds' efforts to block access" to dealers' data within the Reynolds DMS.

52. CDK and Reynolds, however, labored to identify third-party workarounds and cut off access. *The Banks Report*, an automotive industry publication, says that Reynolds has been "play[ing] this game for years," where a vendor "get[s] shut out, and then find[s] a way to work around the problem," but then Reynolds "finds the backdoor entry and shuts it[] down." "It's almost like 'What-A-Mole.'"

### H. CDK and Reynolds Successfully Exclude Competitors in The Data Integration Market

53. At one time, over a dozen data integrators competed for vendors' business. But no longer. Authenticom—one data integrator—for example, said that it is "insolvent and on the verge of collapse" due to CDK and Reynolds' exclusionary anticompetitive conduct.

54. By eliminating competitors from the market, CDK and Reynolds caused the price for data integration services to skyrocket.

### I. The Price for Data Integration Services Skyrockets After CDK and Reynolds Exclude Third-Party Integrators

55. CDK and Reynolds have used their control of dealer data to impose exorbitant fees on any party wishing to extract that data. As a result, dealers are forced to pay excessive amounts to vendors, whose fees incorporate the cost of data integration. And by eliminating all competitors, CDK and Reynolds are able to charge supracompetitive prices for data integration.

56. CDK and Reynolds' anticompetitive conduct was designed to and did artificially inflate the price of data integration services. Independent data integrator service providers, before CDK and Reynolds' anticompetitive conduct, charged vendors

approximately $50 to 70 per month per dealership connection. Since the consummation of CDK and Reynolds' 2015 agreement not to compete, CDK and Reynolds have charged vendors, on average, $300 per month for the same services, with some vendors paying up to $900 per month per dealership. Vendors pass this average six-fold increase in the cost of data integration to their customers, the dealers.

57.    One vendor, Dominion, said that it used to pay only $30 to have a third-party, Authenticom, integrate dealer data. Now, for the same data integration services, Dominion has to pay $893 to Reynolds or $457 to CDK.

58.    Today, Reynolds charges vendors up to $900 per month per dealership to gain access to a dealer's data within Reynolds' DMS platform.

59.    Since consummating its deal with Reynolds in 2015, CDK has increased its posted price for software integration from $70 per software product to $250-$300 per software product for each dealership that the vendor services. According to *The Banks Report*, prices to access data in CDK's platform increased between 300 percent and 800 percent.

60.    One vendor reported that it was now being forced to pay $6 million in combined integration fees to CDK and Reynolds for access to its clients' data.

61.    In an evidentiary hearing to consider whether CDK and Reynolds should be preliminarily enjoined from barring vendors from accessing their own customers' data within CDK and Reynolds' DMS platforms, the W.D. Wisc. wrote that "testimony from software vendors suggests that data integration prices have risen considerably, particularly in comparison to prices charged by third-party integrators."

62.    Because data integration costs are passed on to the dealers, dealers end up footing the bill for accessing their own data. The president of a Lexus dealership said that

one of his "key application providers" raised its monthly price by $500 due to "CDK's integration fees." He said that he was, in essence, "footing the bill" so that "one of [his] key application providers can access [his] own data."

63.     Dealerships that have more than 20 rooftops (stores) are likely to work with more than 80 vendors that need third-party access from CDK or Reynolds. If a dealership works with 80 vendors and has to pay $400 fees that are passed on from a vendor, they could end up paying an extra $32,000 each month.

**J.      CDK and Reynolds Break Integration with Their Platforms to Maintain Their Duopoly**

64.     Together, CDK and Reynolds maintain a duopoly in the DMS market with 75 percent market share. By preventing third parties from accessing data within their platforms, CDK and Reynolds acted to maintain their duopoly.

65.     Data migration can be a cumbersome and costly process, making it difficult to switch from one DMS provider to another. There are, however, data migration vendors who can make migration much easier.[2] Unfortunately, since 2007 for Reynolds and 2015 for CDK, these migration vendors have not been allowed to access dealers' data within the Reynolds and CDK platforms. As a result, such vendors are not able to facilitate a streamlined migration for dealers that want to switch DMS providers.

66.     And while CDK and Reynolds have made it relatively easy to migrate between members of the duopoly by granting each other integration with the other's systems, all other DMS providers have no such luck. Two additional written agreements between CDK and Reynolds "granted reciprocal access" to each other's data integration products. Reynolds, for example, received integration with CDK's DMS platform for free.

---

[2] Globanet, *Data Migration Best Practices* (2012), http://bit.ly/2DzXZaA.

67. Rival DMS providers are not granted access to CDK or Reynolds' systems, preventing them from easily migrating customer data from CDK or Reynolds' DMS database to the new provider's database. Other DMS providers, such as Dealertrack Technologies (merged with Cox Automotive), Auto/Mate, and AutoSoft, find it difficult to convince dealers to switch platforms when transitioning to the new platform will be a slow, cumbersome, and expensive process.

68. CDK and Reynolds also maintained their market share in the DMS market by squashing third-party application vendors that were starting to replace part of the functionality of CDK and Reynolds' DMS software. According to Cox Automotive, "Internal CDK documents explain the motivation behind CDK's agreement with Reynolds to eliminate competition in the data integration market. First, the enormous success of third-party products and services like those offered by Cox Automotive – made possible by integration with dealer data – began to threaten CDK's and Reynolds' DMS duopoly. As dealers increasingly used these third-party products and services, they began to rely less on CDK's and Reynolds' antiquated, monolithic DMS enterprise software. The third-party products and services began to perform tasks traditionally performed by the DMS, and to do so more efficiently and while offering greater features and functionality. Dealers also began entering data directly into the third-party solutions in the first instance, bypassing the DMS completely. CDK and Reynolds knew that this would eventually make it less difficult for dealers to switch DMS providers or even to forego a DMS entirely. By seizing control over dealer data, CDK and Reynolds have sought to forestall that threat to their legacy DMS duopoly." CDK's own documents state – and its employees have testified – that CDK wanted to leverage its duopoly control over the DMS market to "tilt the table" in favor of its own offerings.

18

69.     A letter from the President of the National Automotive Dealers Association explains how CDK and Reynolds have funneled dealers back into using services offered by CDK or Reynolds' DMS platform, rather than using more specialized third-party applications, by cutting off third parties access to dealers' data or charging an exorbitant fee to access the data:

> It is like a dealership is "held hostage" with its own data. This is unfair and unreasonable. The DMS providers insist that the only way for a dealer not to experience this unfair surcharge is to utilize products that are exclusive to the DMS provider in lieu of a dealership choosing the vendor it desires. I believe that a dealership should be able to partner with the third party vendor that has the best solution to assist the dealership with making more sales and more gross profit, and not an internal vendor that is … controlled by a DMS provider.

**K.      CDK and Reynolds Develop A Pretext for Cutting Off Vendors and Integrators' Access to the CDK and Reynolds Platforms: Data Security**

70.     CDK and Reynolds both cloaked their shutoffs of third-party access as being part of a data security initiative, even though the cybersecurity landscape that Reynolds faced when it closed off access in August 2011 was very different from the one CDK faced in June 2015.

71.     As part of its "security" initiative, Reynolds required third parties who wanted access to the Reynolds DMS platform to—in addition to paying a per dealership fee for access to data—also become "certified" by Reynolds. *Automotive News* reports that "[t]he vendors have to pay a certification fee; Reynolds has declined to say how much."

72.     After entering into a horizontal agreement with Reynolds in 2015, CDK also implemented a "security" program called SecurityFirst. Third parties that want continued access to CDK's DMS platform had to be "certified" by CDK and pay higher fees to participate as a "certified" vendor. Participating vendors immediately saw their data integration costs soar by 300 to 800 percent.

73.     *Automotive News* also reported that it spoke with senior executives of three

19

large third-party vendors, who spoke on the condition of anonymity, "fearing reprisals" from CDK. The vendors said that the SecurityFirst program was raising their monthly data integration costs from $50 per dealer per month to as much as $600 per dealer per month. *Automotive News* reported that "[a] vendor executive who asked not to be named called the data-access cost a surcharge under the guise of data security."

74.      *Automotive News* reported that "[a] cybersecurity expert who worked for the Clinton and Obama administrations says CDK Global Inc. and Reynolds and Reynolds have no justifiable 'security' or 'privacy' needs to block data integrators from accessing their dealership management systems."

**L.      Plaintiff's Experience**

75.      Plaintiff Kenny Thomas Enterprises, Inc. runs a car dealership in Olathe, Kansas. During the relevant time period, Kenny Thomas Enterprises used CDK as its DMS provider. In July 2015, Kenny Thomas Enterprises' contract with CDK came up for renewal. Plaintiff investigated switching to another DMS provider, which would have been $2,000 cheaper per month. This DMS provider, however, stated that it could not extract and migrate Plaintiff's data from CDK's data management system to the new provider's system, due to CDK's blocking of third-party access to Plaintiff's data. Because Kenny Thomas Enterprises needed access to its data in order to run its dealership, it was forced to stay with CDK, despite the substantially higher price for the same functionality.

**M.      Federal Indirect Purchaser Claims**

76.      Indirect purchasers are eligible to bring federal antitrust claims when costs are directly passed on to them as part of a pre-existing contractual agreement.

77.      When CDK or Reynolds charged vendors for integration fees, dealers ended up paying this cost because vendors passed on the integration fees to the dealers, under their

pre-existing contract with the dealers.

78.     CDK and Reynolds are estopped from contesting dealers' "cost-plus" antitrust standing because CDK and Reynolds took active steps to conceal and obscure the fact and amounts of integration costs that vendors passed on to dealers. The standard Reynolds' vendor contract prohibits the vendor from disclosing integration costs to dealers, even when the vendor is passing these costs on to the dealer. "Similarly, CDK prevents vendors from putting a line item on their bills attributable to [integration] charges."[3] As a result, vendors are prohibited from providing a line item on dealers' bills showing the amount of integration charges being directly passed on to the dealer, even where the vendor passes on 100% of the integration costs.

79.     Because CDK and Reynolds took deliberate steps to attempt to circumvent "cost-plus" standing, they are estopped from raising this issue as a defense against indirect purchasers.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff seeks certification of a Class defined to include:

> All persons and entities residing in the United States engaged in the business of the retail sale of automobiles who directly purchased DMS from one or more Defendants or co-conspirator, or any predecessor, successor, subsidiary or affiliate, and indirectly purchased data integration services from one or more Defendants or co-conspirator, or any predecessor, successor, subsidiary or affiliate, from January 1, 2011 to the present, or until the anticompetitive effects of Defendants' conduct cease.

81.     Plaintiff seeks certification of a Kansas Subclass defined to include:

> All persons and entities residing in the state of Kansas engaged in the business of the retail sale of automobiles who directly purchased DMS from one or more Defendants or coconspirator, or any

---

[3] Order on Preliminary Injunction, *Authenticom v. CDK*, No. 17-cv-00318, 2017 U.S. Dist. LEXIS 109409 (W.D. Wis. July 14, 2017).

predecessor, successor, subsidiary or affiliate and indirectly purchased the data integration services from one or more Defendants or co-conspirator, or any predecessor, successor, subsidiary or affiliate, from January 1, 2011 to the present, or until the anticompetitive effects of Defendants' conduct cease.

82.     Excluded from the Class are (a) Defendants and their officers, including any entity or division in which Defendants have a controlling interest, as well as their directors, management, employees, agents, officers, trustees, subsidiaries, affiliates, assigns, and successors, and other persons or entities related to, or affiliated with Defendants; and (b) the Judges to whom this case is assigned, their staff, and their immediate families.

83.     The exact number of Class members is unknown to Plaintiff. Due to the nature of the trade and commerce involved, Plaintiff believes there are likely thousands of Class members geographically dispersed throughout the United States such that joinder of all Class members is impracticable.

84.     There are questions of law and fact common to the Class, including but not limited to, the following:

      (a)     Whether Defendants engaged in or entered into a contract combination or conspiracy among themselves to fix or artificially inflate prices, and allocate customers of DMS and data integration services supplied in the United States;

      (b)     Whether Defendants' unlawful conduct has enabled them to artificially inflate or fix prices and allocate customers of DMS and data integration services supplied in the United States;

      (c)     The effect of the combination or conspiracy on the prices of DMS and data integration services supplied in the United States during the class period (January 1, 2011 to present);

     (d)     Whether Defendants agreed allocate customers by not pursuing those customers' business in the data integration services market;

     (e)     The identity of the co-conspirators;

     (f)     Whether Defendants and their co-conspirators violated Sections 1 and 2 of the Sherman Act;

     (g)     Whether the conduct of Defendants and their co-conspirators caused injury to the business of Plaintiff and Class members;

     (h)     The appropriate measure of damages sustained by Plaintiff and Class members;

     (i)     The type of injunctive relief that is appropriate;

     (j)     Whether Plaintiff and the Class members should be awarded attorneys' fees and costs.

85.     These common questions and others predominate over questions, if any, that affect only individual Class members.

86.     Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of the Class because Plaintiff purchased its DMS directly from one or more Defendants or their co-conspirators and Plaintiff indirectly purchased data integration services from one or more Defendants or their co-conspirators. As a result, Plaintiff and all Class members were injured by the same wrongful conduct of Defendants, and the relief sought is common to all Class members.

87.     Plaintiff will fairly and adequately protect and represent the interests of the Class.

88.     The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. By advancing its claim, Plaintiff will also advance the claims of all Class members

because Defendants participated in activities that caused all Class members to suffer similar injuries.

89.     Plaintiff and its counsel will fairly and adequately protect the interests of absent Class members. There are no material conflicts between Plaintiff's claims and those of absent Class members that would make class certification inappropriate. Counsel for Plaintiff are highly experienced in complex class action litigation, including antitrust litigation, and will vigorously assert Plaintiff's claims and those of absent Class members.

90.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

91.     A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by Plaintiff and each Class member are relatively small as compared to the expense and burden of individual prosecution of claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiff and Class members to redress the wrongs done to them. It would also be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system.

## ANTITRUST INJURY

92.     The aforesaid conspiracy had the following effects, among others:

(a)     Price competition among the Defendants and co-conspirators in the sale and supply of DMS and

24

data integration services was restrained and suppressed;

(b)     Prices of for the sale and supply of DMS and data integration services in the United States was fixed, raised, maintained and/or stabilized at supracompetitively higher, non-competitive levels;

(c)     Direct purchasers of DMS, including Plaintiff and Class members, were deprived of the benefit of free and open competition in the purchase of DMS; and

(d)     Indirect purchasers of data integration services, including Plaintiff and Class members, were deprived of the benefit of free and open competition in the purchase of data integration services.

93.     The effect of Defendants and co-conspirators' anticompetitive conduct, as alleged herein, has been to artificially inflate the prices for the sale and supply of DMS and data integration services in the United States. By engaging in a price-fixing conspiracy, prices have been supported at artificially high levels throughout the United States, and as a result, direct purchasers of DMS have paid supracompetitive prices, and indirect purchasers of data integration services have paid supracompetitive prices.

94.     As a result of the Defendants' anticompetitive conduct, Plaintiff and Class members paid more for the sale and supply of DMS and data integration services in the absence of the conspiracy than they would have, and thus suffered substantial damages.

**COUNT I:**        **VIOLATION OF SECTION 1 OF SHERMAN ACT FOR ENTERING A HORIZONTAL AGREEMENT TO REDUCE COMPETITION IN THE DATA INTEGRATION SERVICES MARKET**

95.      Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

96.      CDK and Reynolds are horizontal competitors of one another in the DMS market and the data integration services market.

97.      In February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the data integration services market.

98.      In so doing, CDK and Reynolds have entered into and continue to engage in an agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

99.      These horizontal market share agreements did reduce competition in the data integration services market.

100.      The conspiracy between CDK and Reynolds consists of a continuing agreement, understanding, and concerted action to eliminate competition in the DMS market and the data integration services market.

101.      Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future and the Court remedies the conditions Defendants created in the DMS market and the data integration services market. Otherwise, Plaintiff and the Class will continue to pay more for DMS services and data integration services than they would have in the absence of the conspiracy. And without swift action, data integrators will

26

be forced to exit the market and competition will be permanently foreclosed.

**COUNT II:**      **VIOLATION OF SHERMAN ACT FOR IMPOSITION OF EXCLUSIVE DEALING PROVISIONS**

102.      Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

103.      CDK and Reynolds entered into contracts with dealers and vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

104.      Pursuant to their conspiracy to eliminate competition in the data integration market, CDK and Reynolds inserted exclusive dealing provisions in their contracts with dealers and vendors. The contracts with dealers provide that dealers cannot provide access to their data to any data integrator except CDK or Reynolds. Likewise, the contracts with vendors provide that vendors cannot obtain data for dealers who use CDK or Reynolds DMS by employing a data integrator other than CDK or Reynolds. These provisions are standard in all Defendants' contracts with dealers and vendors.

105.      CDK and Reynolds were able to impose these exclusive dealing provisions on dealers and vendors as a result of their market power in the DMS market and the data integration services market.

106.      Because CDK and Reynolds imposed these exclusive dealing provisions pursuant to their conspiracy to eliminate competition in the data integration services market these agreements are *per se* illegal.

107.      These exclusive dealing provisions have caused actual injury to competition in the DMS market and the data integration services market.

108.      Defendants' exclusive dealing agreements do not enhance efficiency or

27

competition in the DMS or data integration services markets. On the contrary, the agreements have produced only anticompetitive effects in both markets.

109. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury to their business or property.

110. Plaintiff and the Class are entitled to treble damages for these violations of the Sherman Act.

111. Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to impose unlawful exclusive dealing provisions in the future and the Court remedies the conditions Defendants created in the DMS and data integration services markets. Otherwise, Plaintiff and the Class will continue to pay more for DMS and data integration services than they would have in the absence of the conspiracy. And without swift action, data integrators will be forced to exit the market and competition will be permanently foreclosed.

**COUNT III**:    **VIOLATION OF SHERMAN ACT FOR ILLEGALLY TYING THE PROVISION OF DATA INTEGRATION SERVICES TO THE PURCHASE OF DATA MANAGEMENT SERVICES**

112. Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

113. CDK and Reynolds have imposed tying arrangements on dealers that unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

114. CDK and Reynolds have tied dealers' use of Defendants' integration services to their DMS services. As a condition of dealers using Defendants' DMS services, Defendants also require dealers to use Defendants' own integration services and not use their competitors' integration services. In this way, Defendants coerce customers of their DMS,

28

*i.e.*, dealers, into using Defendants' data integration services.

115. DMS systems are a separate and distinct product from dealer data integration services.

116. Defendants have sufficient market power in the market for DMS, where they have had a longstanding duopoly, to appreciably restrain free competition in the market for the tied product (data integration services). Defendants have demonstrated their ability to leverage their market power in the DMS market to control prices and exclude competition in the tied market (for data integration services).

117. Defendants' tying arrangements have affected a substantial amount of interstate commerce.

118. Defendants' tying arrangements are a *per se* violation of the federal antitrust laws and are unreasonable and unlawful restraints of trade and commerce.

119. As a direct and proximate result of Defendants' unlawful tying arrangement, Plaintiff and the Class have suffered injury to their business or property.

120. Plaintiff and the Class are entitled to treble damages for these violations of the Sherman Act.

121. Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful tying arrangements in the future and the Court remedies the conditions Defendants created in the data integration services and DMS markets. Otherwise, Plaintiff and the Class will continue to pay more for DMS and data integration services than they would have in the absence of the conspiracy. And without swift action, data integrators will be forced to exit the market and competition will be permanently foreclosed.

**COUNT IV:** **VIOLATION OF SECTION 2 OF SHERMAN ACT FOR MONOPOLIZATION OF THE DMS AND DATA**

## INTEGRATION SERVICES MARKETS

122.    Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

123.    CDK and Reynolds have unlawfully monopolized the data integration services market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

124.    In the primary DMS market, CDK and Reynolds have a longstanding duopoly. When dealers purchase CDK's or Reynolds' brand of DMS, they are locked in to that brand through a long-term contract (typically seven years) and the significant financial costs and time associated with switching to a new DMS platform. For example, one serious cost of switching is the amount of time that a dealer's DMS will be offline during a transition. Downtime occurs when the DMS database needs to be taken offline, which prevents the dealer from performing any services that rely on the DMS, such as the ability to secure vehicle financing and consummate an auto sale, and other vital business functions. *Evolven* found that 48 percent of business owners say their businesses "can't tolerate more than 24 hours downtime."

125.    CDK and Reynolds used improper means to maintain their duopoly in the DMS market by technologically and contractually blocking data integrators from accessing dealers' data within Defendants' DMS platforms. By blocking access, CDK and Reynolds made migration of data from their DMS to a new DMS much more difficult because data migration vendors and/or the new DMS provider are unable to access the old data to port it over to the new system. According to *Globanet*, having a best-in-breed migration vendor would make a substantial difference for a business faced with a large data migration. There are migration vendors that, if given access, can migrate a DMS database with near-zero

downtime.[4]

126.    By willfully creating and maintaining customer lock-in in the DMS market, CDK and Reynolds have monopolized the market for DMS services.

127.    CDK and Reynolds also used their market power to create and maintain a duopoly in the market for data integration services, which is an aftermarket for DMS services. Each Defendant has created a total monopoly in the data integration aftermarket for their particular DMS platform because no other data integrator is currently allowed access to the data residing within CDK or Reynolds' platform. These platforms, however, were at one time open and allowed access to anyone authorized by the dealer to access the dealer's data.

128.    CDK and Reynolds used anticompetitive means to acquire and maintain monopolies in the market for data integration services, including by blocking and disabling third-party integrators from accessing dealer data, entering into a market division agreement pursuant to which they agreed not to compete in each other's aftermarkets, and imposing anticompetitive exclusive dealing arrangements on dealers and vendors who were locked into their platform.

129.    Defendants' ability to exclude competition and impose massive price increases demonstrates their market power in the data integration market. And such conduct has no pro-competitive business justification.

130.    As a direct and proximate result of CDK and Reynolds' unlawful use of their duopoly power, Plaintiff and the Class have suffered injury to their business or property.

131.    Plaintiff and the Class are entitled to treble damages for these violations of the Sherman Act.

---

[4] *See* Wai Lam, *Breaking the Data Migration Shackle*, CirrusData (Mar. 8, 2016), http://www.cdsi.us.com/breaking-data-migration-shackle/.

31

**COUNT V:**      **UNJUST ENRICHMENT**

132.    Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

133.    Plaintiff brings this claim on behalf of itself and the Kansas Subclass.

134.    Defendants are engaged in the conduct of trade and commerce in the state of Kansas.

135.    Defendants charge dealers exorbitant fees for DMS services by which they gain access to dealers' data and then overage dealers to utilize their own data by foreclosing competition in the data integration market. Defendants have wrongfully profited at the expense of Plaintiff and the Kansas Subclass.

136.    Because it would be unjust for Defendants to retain their ill-gotten gains, Plaintiff and the Kansas Subclass are entitled to restitution and/or disgorgement of the Defendants' profits from their exorbitant fees in the markets for DMS and data integration services.

**COUNT VI:**      **VIOLATION OF KANSAS UNFAIR TRADE AND CONSUMER PROTECT ACT FOR ENTERING A HORIZONTAL AGREEMENT TO RESTRAIN COMPETITION IN THE MARKET FOR DATA INTEGRATION SERVICES**

137.    Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

138.    Plaintiff brings this claim on behalf of itself and the Kansas Subclass, including both direct and indirect purchasers, as authorized by K.S. § 50-161(b), and § 50-163(d)(2).

139.    CDK and Reynolds are horizontal competitors of one another in the DMS market and the data integration services market.

140.    In February 2015, CDK and Reynolds entered into formal written agreements not to compete with each other in the data integration services market.

141.    In so doing, CDK and Reynolds have entered into and continue to engage in a trust, arrangement, or agreement in restraint of trade in violation of K.S. § 50-101 and K.S. § 50-112.

142.    These horizontal market share agreements did reduce competition in the data integration services market.

143.    The conspiracy between CDK and Reynolds consists of a continuing trust, arrangement, agreement, and concerted action to eliminate competition in the DMS market and the data integration services market.

144.    As a direct and proximate result of CDK and Reynolds' unlawful trust, arrangement, or agreement in restraint of trade, Plaintiff and the Kansas Subclass have suffered injury to their business or property.

145.    Plaintiff and the Kansas Subclass are entitled to treble damages for these violations of the Kansas Unfair Trade and Consumer Protect Act and reasonable attorneys' fees and costs, pursuant to K.S. § 50-161(b) and (c).

146.    Plaintiff and the Kansas Subclass face the threat of injury or additional injury by reason of the Defendants' violations and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future and the Court remedies the conditions Defendants created in the DMS market and the data integration services market. Otherwise, Plaintiff and the Kansas Subclass will continue to pay more for DMS services and data integration services than they would have in the absence of the conspiracy. And without swift action, data integrators will be forced to exit the market and competition will be permanently foreclosed.

**COUNT VII:** **VIOLATION OF KANSAS UNFAIR TRADE AND CONSUMER PROTECTION ACT FOR IMPOSITION OF EXCLUSIVE DEALING PROVISIONS**

147.    Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

148.    Plaintiff brings this claim on behalf of itself and the Kansas Subclass, including both direct and indirect purchasers, as authorized by K.S. § 50-161(b), and § 50-163(d)(2).

149.    CDK and Reynolds entered into contracts with dealers and vendors that contain exclusive dealing provisions that unreasonably restrain trade in violation of K.S. § 50-101 and K.S. § 50-112.

150.    Pursuant to their conspiracy to eliminate competition in the data integration market, CDK and Reynolds inserted exclusive dealing provisions in their contracts with dealers and vendors. The contracts with dealers provide that dealers cannot provide access to their data to any data integrator except CDK or Reynolds. Likewise, the contracts with vendors provide that vendors cannot obtain data for dealers who use CDK or Reynolds DMS by employing a data integrator other than CDK or Reynolds. These provisions are standard in all Defendants' contracts with dealers and vendors.

151.    CDK and Reynolds were able to impose these exclusive dealing provisions on dealers and vendors as a result of their market power in the DMS market and the data integration services market.

152.    These exclusive dealing provisions have caused actual injury to competition in the DMS market and the data integration services market.

153.    Defendants' exclusive dealing agreements do not enhance efficiency or competition in the DMS or data integration services markets. On the contrary, the agreements

have produced only anticompetitive effects in both markets.

154.    As a direct and proximate result of CDK and Reynolds' unlawful trust, arrangement, or agreement in restraint of trade, Plaintiff and the Kansas Subclass have suffered injury to their business or property.

155.    Plaintiff and the Kansas Subclass are entitled to treble damages for these violations of the Kansas Unfair Trade and Consumer Protect Act and to reasonable attorneys' fees and costs pursuant to K.S. § 50-161(b) and (c).

156.    Plaintiff and the Kansas Subclass face the threat of injury or additional injury by reason of Defendants' violations and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful exclusivity agreements in the future and the Court remedies the conditions Defendants created in the DMS market and the data integration services market. Otherwise, Plaintiff and the Kansas Subclass will continue to pay more for DMS services and data integration services than they would have in the absence of the conspiracy. And without swift action, data integrators will be forced to exit the market and competition will be permanently foreclosed.

**COUNT VIII:    VIOLATION OF KANSAS UNFAIR TRADE AND CONSUMER PROTECTION ACT FOR TYING THE PROVISION OF DATA INTEGRATION SERVICES TO THE PURCHASE OF DATA MANAGEMENT SERVICES**

157.    Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

158.    Plaintiff brings this claim on behalf of itself and the Kansas Subclass, including both direct and indirect purchasers, as authorized by K.S. § 50-161(b) and K.S. § 50-163(d)(2).

159.    CDK and Reynolds have imposed tying arrangements on dealers that unreasonably restrain trade in violation of K.S. § 50-101 and K.S. § 50-112.

160.     CDK and Reynolds have tied dealers' use of Defendants' integration services to their DMS services. As a condition of dealers using Defendants' DMS services, Defendants also require dealers to use Defendants' own integration services and not use their competitors' integration services. In this way, Defendants coerce customers of their DMS, *i.e.*, dealers, into using Defendants' data integration services.

161.     DMS systems are a separate and distinct product from dealer data integration services.

162.     Defendants have sufficient market power in the market for DMS, where they have had a longstanding duopoly, to appreciably restrain free competition in the market for the tied product (data integration services). Defendants have demonstrated their ability to leverage their market power in the DMS market to control prices and exclude competition in the tied market (for data integration services).

163.     Defendants' tying arrangements have affected a substantial amount of interstate commerce.

164.     Defendants' tying arrangements are a per se violation of the federal antitrust laws and are unreasonable and unlawful restraints of trade and commerce.

165.     As a direct and proximate result of CDK and Reynolds' unlawful tying arrangement in restraint of trade, Plaintiff and the Kansas Subclass have suffered injury to their business or property.

166.     Plaintiff and the Kansas Subclass are entitled to treble damages for these violations of the Kansas Unfair Trade and Consumer Protect Act and to reasonable attorneys' fees and costs pursuant to K.S. § 50-161(b) and (c).

167.     Plaintiff and the Kansas Subclass face the threat of injury or additional injury by reason of Defendants' violations and will suffer irreparable harm unless Defendants are

enjoined from continuing to implement their unlawful tying arrangement in the future and the Court remedies the conditions Defendants created in the DMS market and the data integration services market. Otherwise, Plaintiff and the Kansas Subclass will continue to pay more for DMS services and data integration services than they would have in the absence of the conspiracy. And without swift action, data integrators will be forced to exit the market and competition will be permanently foreclosed.

**COUNT IX:** **VIOLATION OF KANSAS UNFAIR TRADE AND CONSUMER PROTECT ACT FOR MONOPOLIZATION OF THE DMS AND DATA INTEGRATION SERVICES MARKETS**

168. Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

169. Plaintiff brings this claim on behalf of itself and the Kansas Subclass, including both direct and indirect purchasers, as authorized by K.S. § 50-161(b) and K.S. § 50-163(d)(2).

170. CDK and Reynolds have unlawfully monopolized the data integration services market in violation of K.S. § 50-132.

171. CDK and Reynolds do business within the state of Kansas.

172. In the primary DMS market, CDK and Reynolds have a longstanding duopoly. When dealers purchase CDK's or Reynolds' brand of DMS, they are locked in to that brand through a long-term contract (typically seven years) and the significant financial costs and time associated with switching to a new DMS platform. For example, one serious cost of switching is the amount of time that a dealer's DMS will be offline during a transition. Downtime occurs when the DMS database needs to be taken offline, which prevents the dealer from performing any services that rely on the DMS, such as the ability to secure vehicle financing and consummate an auto sale, and other vital business functions.

*Evolven* found that 48 percent of business owners say their businesses "can't tolerate more than 24 hours downtime."

173.    CDK and Reynolds used improper means to maintain their duopoly in the DMS market by technologically and contractually blocking data integrators from accessing dealers' data within Defendants' DMS platforms. By blocking access, CDK and Reynolds made migration of data from their DMS to a new DMS much more difficult because data migration vendors and/or the new DMS provider are unable to access the old data to port it over to the new system. According to *Globanet*, having a best-in-breed migration vendor would make a substantial difference for a business faced with a large data migration. There are migration vendors that, if given access, can migrate a DMS database with near-zero downtime.[5]

174.    By willfully creating and maintaining customer lock-in in the DMS market, CDK and Reynolds have monopolized the market for DMS services.

175.    CDK and Reynolds also used their market power to create and maintain a duopoly in the market for data integration services, which is an aftermarket for DMS services. Each Defendant has created a total monopoly in the data integration aftermarket for their particular DMS platform because no other data integrator is currently allowed access to the data residing within CDK or Reynolds' platform. These platforms, however, were at one time open, and allowed access to anyone authorized by the dealer to access the dealer's data.

176.    CDK and Reynolds used anticompetitive means to acquire and maintain monopolies in the market for data integration services, including by blocking and disabling third-party integrators from accessing dealer data, entering into a market division agreement

---

[5] *See* Wai Lam, *Breaking the Data Migration Shackle*, CirrusData (Mar. 8, 2016), http://www.cdsi.us.com/breaking-data-migration-shackle/.

pursuant to which they agreed not to compete in each other's aftermarkets, and imposing anticompetitive exclusive dealing arrangements on dealers and vendors who were locked into their platform.

177.     Defendants' ability to exclude competition and impose massive price increases demonstrates their market power in the data-integration market. And such conduct has no pro-competitive business justification.

178.     As a direct and proximate result of CDK and Reynolds' unlawful use of their duopoly power, Plaintiff and the Kansas Subclass have suffered injury to their business or property.

179.     Plaintiff and the Kansas Subclass are entitled to treble damages for these violations of the Kansas Unfair Trade and Consumer Protect Act and to reasonable attorneys' fees and costs pursuant to K.S. § 50-161(b) and (c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, hereby demands:

a)     certification of this action as a class action, appointment of Plaintiff as class representative, and appointment of Plaintiff's counsel of record as class counsel;

b)     a declaration that CDK and Reynolds' actions described violate Sections 1 and 2 of the Sherman Act, Section 4 of the Clayton Act, and K.S. §§ 50-101, 50-112, and 50-132;

c)     an order enjoining CDK and Reynolds, and any other person acting on their behalf, from continuing, maintaining, renewing, effectuating, or enforcing the contract, combination, or conspiracy alleged herein, or from engaging in any other contract, combination, or conspiracy having similar purpose or effect, and requiring Defendants to

39

take affirmative steps to dissipate the effects of their violations;

        d)      restitution and disgorgement of all profits wrongfully obtained;

        e)      an award to Plaintiff and the Class of all damages, including treble damages,

attorneys' fees, and reimbursement of litigation expenses, recoverable under applicable law;

        f)      an award to Plaintiff and the Class of pre- and post-judgment interest; and

        g)      such other relief as this Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demand a trial by jury on all applicable claims to the maximum number of jurors permitted by law.

Dated: January 24, 2018        By: */s/ Mark H. Troutman*

                            Mark H. Troutman (0076390), Trial Attorney
                            Shawn K. Judge (0069493)
                            Gregory M. Travalio (0000855)
                            ISAAC WILES BURKHOLDER & TEETOR, LLC
                            Two Miranova Place
                            Suite 700
                            Columbus, Ohio 43215-5098
                            phone 614.221.2121
                            fax 614.365.9516
                            mtroutman@isaacwiles.com
                            sjudge@isaacwiles.com
                            gtravalio@isaacwiles.com

                            Eric H. Gibbs
                            Michael L. Schrag
                            Aaron Blumenthal
                            GIBBS LAW GROUP LLP
                            505 14th Street, Suite 1110
                            Oakland, CA 94612
                            Telephone: (510) 350-9700
                            Facsimile: (510) 350-9701
                            ehg@classlawgroup.com
                            mls@classlawgroup.com
                            ab@classlawgroup.com
                            *to be admitted pro hac vice*

Jeffrey L. Wagoner, KS #17489/MO #44365
WM Law
15095 W. 116th Street
Olathe, KS 66062
(913) 422-0909/Fax (913) 428-8549
jeffwagoner@wagonergroup.com
*to be admitted pro hac vice*

Daniel F.B. Peel, TN #019245/TX #15721200
119 S. Main, Suite 500
Memphis, TN 38103
(901) 322-8700/Fax (901) 322-8701
dpeel@me.com
*to be admitted pro hac vice*

Paul C. Peel, TN #19536/MS #102586
Farris Bobango Branan, PC
999 South Shady Grove Road, Suite 500
Memphis, TN 38120
(901) 259-7100/Fax (901) 259-7150
ppeel@farris-law.com
*to be admitted pro hac vice*

*Attorneys for Plaintiff*